**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

COMPREHENSIVE DRUG TESTING, INC.,
*Defendant-Appellee.*

No. 05-10067
D.C. No.
MISC-04-234-SI

Appeal from the United States District Court
for the Northern District of California
Susan Yvonne Illston, District Judge, Presiding

MAJOR LEAGUE BASEBALL PLAYERS
ASSOCIATION,
*Petitioner-Appellee,*

v.

UNITED STATES OF AMERICA,
*Respondent-Appellant.*

No. 05-15006
D.C. No.
CV-04-00707-JCM

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

13933

IN RE: SEARCH WARRANTS
EXECUTED ON APRIL 8, 2004 AT
CDT, INC.,

*In Re,*

SEAL 1,

*Plaintiff-Appellant,*

v.

SEAL 2,

*Defendant-Appellee.*

No. 05-55354

D.C. No.
CV-04-02887-FMC

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted
December 18, 2008—Pasadena, California

Filed September 13, 2010

Before: Alex Kozinski, Chief Judge, Andrew J. Kleinfeld,
Susan P. Graber, Kim McLane Wardlaw, W. Fletcher,
Richard A. Paez, Marsha S. Berzon, Consuelo M. Callahan,
Carlos T. Bea, Milan D. Smith, Jr. and Sandra S. Ikuta,
Circuit Judges.

Per Curiam Opinion;
Concurrence by Chief Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge Bea;
Partial Concurrence and Partial Dissent by Judge Callahan;
Dissent by Judge Ikuta

## COUNSEL

Argued by Joseph Douglas Wilson, Assistant United States Attorney, San Francisco, California, who was joined on the briefs by Erika R. Frick, Assistant United States Attorney, San Francisco, California, for the United States.

Argued by Elliot R. Peters, Keker & Van Nest LLP, San Francisco, California, who was joined on the briefs by David J. Silbert, Keker & Van Nest LLP, San Francisco, California, and Ethan Atticus Balogh, Coleman & Balogh LLP, San Francisco, California, for the Major League Baseball Players Association.

David P. Bancroft, Sideman & Bancroft LLP, San Francisco, California, and Jeffrey C. Hallam Sideman & Bancroft LLP, San Francisco, California, for Comprehensive Drug Testing, Inc.

Peter Buscemi, Morgan, Lewis & Bockius LLP, Washington, DC, for amicus curiae Chamber of Commerce of the United States.

## ORDER

The revised opinion filed concurrently herewith shall constitute the final action of the court. No petitions for rehearing will be considered.

## OPINION

PER CURIAM:

This case is about a federal investigation into steroid use by professional baseball players. More generally, however, it's about the procedures and safeguards that federal courts must observe in issuing and administering search warrants and subpoenas for electronically stored information.

### Facts

The complex facts underlying this case are well summed up in the panel's opinion and dissent, and we refer the interested reader there for additional information. *United States* v. *Comprehensive Drug Testing, Inc.*, 513 F.3d 1085 (9th Cir. 2008). We reiterate here only the key facts.

In 2002, the federal government commenced an investigation into the Bay Area Lab Cooperative (Balco), which it suspected of providing steroids to professional baseball players. That year, the Major League Baseball Players Association (the Players) also entered into a collective bargaining agreement with Major League Baseball providing for suspicionless drug testing of all players. Urine samples were to be collected during the first year of the agreement and each sample was to be tested for banned substances. The players were assured that the results would remain anonymous and confidential; the purpose of the testing was solely to determine whether more than five percent of players tested positive, in which case there would be additional testing in future seasons.

Comprehensive Drug Testing, Inc. (CDT), an independent business, administered the program and collected the specimens from the players; the actual tests were performed by Quest Diagnostics, Inc., a laboratory. CDT maintained the list of players and their respective test results; Quest kept the actual specimens on which the tests were conducted.

During the Balco investigation, federal authorities learned of ten players who had tested positive in the CDT program. The government secured a grand jury subpoena in the Northern District of California seeking *all* "drug testing records and specimens" pertaining to Major League Baseball in CDT's possession. CDT and the Players tried to negotiate a compliance agreement with the government but, when negotiations failed, moved to quash the subpoena.

The day that the motion to quash was filed, the government obtained a warrant in the Central District of California authorizing the search of CDT's facilities in Long Beach. Unlike the subpoena, the warrant was limited to the records of the ten players as to whom the government had probable cause. When the warrant was executed, however, the government seized and promptly reviewed the drug testing records for hundreds of players in Major League Baseball (and a great many other people).

The government also obtained a warrant from the District of Nevada for the urine samples on which the drug tests had been performed. These were kept at Quest's facilities in Las Vegas. Subsequently, the government obtained additional warrants for records at CDT's facilities in Long Beach and Quest's lab in Las Vegas. Finally, the government served CDT and Quest with new subpoenas in the Northern District of California, demanding production of the same records it had just seized.

CDT and the Players moved in the Central District of California, pursuant to Federal Rule of Criminal Procedure 41(g), for return of the property seized there. Judge Cooper found that the government had failed to comply with the procedures specified in the warrant and, on that basis and others, ordered the property returned. We will refer to this as the Cooper Order.

CDT and the Players subsequently moved in the District of Nevada, pursuant to Federal Rule of Criminal Procedure

41(g), for return of the property seized under the warrants issued by that court. The matter came before Judge Mahan, who granted the motion and ordered the government to return the property it had seized, with the exception of materials pertaining to the ten identified baseball players. We will refer to this as the Mahan Order.

CDT and the Players finally moved in the Northern District of California, pursuant to Federal Rule of Criminal Procedure 17(c), to quash the latest round of subpoenas and the matter was heard by Judge Illston. (The original subpoena, and the motion to quash it that was filed in 2003, aren't before us.) In an oral ruling, Judge Illston quashed the subpoenas. We will refer to this as the Illston Quashal. *See* Bryan A. Garner, *A Dictionary of Modern American Legal Usage* 725 (2d ed. 1995).

All three judges below expressed grave dissatisfaction with the government's handling of the investigation, some going so far as to accuse the government of manipulation and misrepresentation. The government nevertheless appealed all three orders and a divided panel of our court reversed the Mahan Order and the Illston Quashal, but (unanimously) found that the appeal from the Cooper Order was untimely. Upon a vote of eligible judges, we took the case en banc. As luck would have it, none of the three judges on the original panel was drawn for this en banc court. Nevertheless, we rely heavily on their work in resolving the case now before us.

## Discussion

For reasons that will become apparent, we don't consider the three orders chronologically. Rather, we consider the Cooper Order first, the Mahan Order next and the Illston Quashal last.

## 1. The Cooper Order

**[1]** The three-judge panel unanimously held that the government's appeal from the Cooper Order was untimely. *Com-*

*prehensive Drug Testing*, 513 F.3d at 1096-1101, 1128. We agree with the panel and adopt its analysis of the issue, seeing no reason to burden the pages of the Federal Reporter by redoing the work the panel already performed so well. On that basis, we dismiss the government's appeal in No. 05-55354.

**[2]** This does not end our discussion of the Cooper Order, however, because it has substantial consequences for the remaining two cases before us. As Judge Thomas pointed out in his panel dissent, once the Cooper Order became final, the government became bound by the factual determinations and issues resolved against it in that order. *Comprehensive Drug Testing*, 513 F.3d at 1130. Specifically, Judge Cooper found that the government failed to comply with the conditions of the warrant designed to segregate information as to which the government had probable cause from that which was swept up only because the government didn't have the time or facilities to segregate it at the time and place of the seizure. Cooper Order at 4. Relatedly, Judge Cooper determined that the government failed to comply with the procedures outlined in our venerable precedent, *United States* v. *Tamura*, 694 F.2d 591 (9th Cir. 1982), which are designed to serve much the same purpose as the procedures outlined in the warrant. Finally, Judge Cooper concluded that the government's actions displayed a callous disregard for the rights of third parties, viz., those players as to whom the government did not already have probable cause and who could suffer dire personal and professional consequences from a disclosure of their test results.

The affidavit supporting the first search warrant, the one that sought the drug testing records of the ten suspected baseball players, contains an extensive introduction that precedes any information specific to this case. The introduction seeks to justify a broad seizure of computer records from CDT by explaining the generic hazards of retrieving data that are stored electronically. In essence, the government explains, computer files can be disguised in any number of ingenious ways, the simplest of which is to give files a misleading name

(pesto.recipe in lieu of blackmail.photos) or a false extension (.doc in lieu of .jpg or .gz). In addition, the data might be erased or hidden; there might be booby traps that "destroy or alter data if certain procedures are not scrupulously followed," Warrant Affidavit at 3; certain files and programs might not be accessible at all without the proper software, which may not be available on the computer that is being searched; there may simply be too much information to be examined at the site; or data might be encrypted or compressed, requiring passwords, keycards or other external devices to retrieve. *Id.* at 4. The government also represented that "[s]earching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence."

By reciting these hazards, the government made a strong case for off-site examination and segregation of the evidence seized. The government sought the authority to seize considerably more data than that for which it had probable cause, including various computers or computer hard drives and related storage media, and to have the information examined and segregated in a "controlled environment, such as a law enforcement laboratory." While the government did not point to any specific dangers associated with CDT, which is after all a legitimate business not suspected of any wrongdoing, it nevertheless made a strong generic case that the data in question could not be thoroughly examined or segregated on the spot.

Not surprisingly, the magistrate judge was persuaded by this showing and granted broad authority for seizure of data, including the right to remove pretty much any computer equipment found at CDT's Long Beach facility, along with any data storage devices, manuals, logs or related materials. The warrant also authorized government agents to examine all the data contained in the computer equipment and storage devices, and to attempt to recover or restore hidden or erased data. The magistrate judge, however, wisely made such broad

seizure subject to certain procedural safeguards, roughly based on our *Tamura* opinion. Thus, the government was first required to examine the computer equipment and storage devices at CDT to determine whether information pertaining to the ten identified players "c[ould] be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data."

The warrant also contained significant restrictions on how the seized data were to be handled. These procedures were designed to ensure that data beyond the scope of the warrant would not fall into the hands of the investigating agents. Thus, the initial review and segregation of the data was not to be conducted by the investigating case agents but by "law enforcement personnel trained in searching and seizing computer data ('computer personnel')," whose job it would be to determine whether the data could be segregated on-site. These computer personnel—not the case agents—were specifically authorized to examine all the data on location to determine how much had to be seized to ensure the integrity of the search. Moreover, if the computer personnel determined that the data did not "fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized," the government was to return those items "within a reasonable period of time not to exceed 60 days from the date of the seizure unless further authorization [was] obtained from the Court." Subject to these representations and assurances, Magistrate Judge Johnson authorized the seizure.

A word about *Tamura* is in order, and this seems as good a place as any for it. *Tamura*, decided in 1982, just preceded the dawn of the information age, and all of the records there were on paper. The government was authorized to seize evidence of certain payments received by Tamura from among the records of Marubeni, his employer. To identify the materials pertaining to the payments involved a three step procedure: Examining computer printouts to identify a transaction; locating the voucher that pertained to that payment; and find-

ing the check that corresponded to the voucher. *Tamura*, 694 F.2d at 594-95. The government agents soon realized that this process would take a long time unless they got help from the Marubeni employees who were present. The employees, however, steadfastly refused, so the agents seized several boxes and dozens of file drawers to be sorted out in their offices at their leisure.

We disapproved the wholesale seizure of the documents and particularly the government's failure to return the materials that were not the object of the search once they had been segregated. *Id.* at 596-97. However, we saw no reason to suppress the properly seized materials just because the government had taken more than authorized by the warrant. For the future, though, we suggested that "[i]n the comparatively rare instances where documents are so intermingled that they cannot feasibly be sorted on site, . . . the Government [should] seal[ ] and hold[ ] the documents pending approval by a magistrate of a further search, in accordance with the procedures set forth in the American Law Institute's Model Code of Pre-Arraignment Procedure." *Id.* at 595-96. "If the need for transporting the documents is known to the officers prior to the search," we continued, "they may apply for specific authorization for large-scale removal of material, which should be granted by the magistrate issuing the warrant only where on-site sorting is infeasible and no other practical alterative exists." *Id.* at 596.

No doubt in response to this suggestion in *Tamura*, the government here did seek advance authorization for sorting and segregating the seized materials off-site. But, as Judge Cooper found, "[o]nce the items were seized, the requirement of the Warrant that any seized items not covered by the warrant be first screened and segregated by computer personnel was completely ignored." Brushing aside an offer by on-site CDT personnel to provide all information pertaining to the ten identified baseball players, the government copied from CDT's computer what the parties have called the "Tracey

Directory" which contained, in Judge Cooper's words, "information and test results involving hundreds of other baseball players and athletes engaged in other professional sports."

Counsel for CDT, contacted by phone, pleaded in vain that "all material not pertaining to the specific items listed in the warrant be reviewed and redacted by a Magistrate or Special Master before it was seen by the Government." Instead, the case agent "himself reviewed the seized computer data and used what he learned to obtain the subsequent search warrants issued in Northern California, Southern California, and Nevada." Judge Cooper also found that, in conducting the seizure in the manner it did, "[t]he Government demonstrated a callous disregard for the rights of those persons whose records were seized and searched outside the warrant."

**[3]** As previously noted, the government failed to timely appeal the Cooper Order and is therefore bound by its factual determinations and legal rulings. The government also failed to appeal another ruling, by Judge Illston, that ordered return of the Tracey directory and all copies thereof. We will call this the Illston Order. It held unlawful the government's failure to segregate data covered by the warrant from data not covered by it simply because both types were intermingled in the Tracey directory. In reaching this conclusion, Judge Illston necessarily rejected the argument about the scope of the warrant the government made before Judge Mahan. The Illston Order therefore has preclusive effect on the core legal questions resolved in the Mahan Order, viz., the government's failure to segregate intermingled data, as required by *Tamura*.

**[4]** Issue preclusion attaches when, as here, "the first and second action involve application of the same principles of law to an historic fact setting that was complete by the time of the first adjudication." *Steen* v. *John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 913 n.5 (9th Cir. 1997) (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4425 (West Supp. 1996)).

The determinations in the Cooper and Illston Orders are significant because orders the government does appeal contain similar findings as to the government's conduct. The government cannot contest those rulings if it is bound by the identical rulings in the Cooper and Illston Orders.

## 2. The Mahan Order

**[5]** Like Judges Cooper and Illston, Judge Mahan determined that "[t]he government callously disregarded the affected players' constitutional rights." Judge Mahan also concluded that the government "unreasonab[ly] . . . refuse[d] to follow the procedures set forth in *United States* v. *Tamura* . . . upon learning that drug-testing records for the ten athletes named in the original April 8 warrants executed at Quest and at [CDT] were intermingled with records for other athletes not named in those warrants." We can and do uphold these findings based on the preclusive effect of the Cooper and Illston Orders. However, because the matter is important, and to avoid any quibble about the proper scope of preclusion, we also dispose of the government's contrary arguments.

### A. Compliance with *Tamura*

The government argues that it *did* comply with the procedures articulated in *Tamura*, but was not required to return any data it found showing steroid use by other baseball players because that evidence was in plain view once government agents examined the Tracey Directory. Officers may lawfully seize evidence of a crime that is in plain view, the government argues, and thus it had no obligation under *Tamura* to return that property. The warrant even contemplated this eventuality, says the government, when it excluded from the obligation to return property any that was "otherwise legally seized."

**[6]** Putting aside the fact that Judges Cooper and Illston, whose courts issued the warrants and whose orders are now final, rejected this argument, it is at any rate too clever by

half. The point of the *Tamura* procedures is to maintain the privacy of materials that are intermingled with seizable materials, and to avoid turning a limited search for particular information into a general search of office file systems and computer databases. If the government can't be sure whether data may be concealed, compressed, erased or booby-trapped without carefully examining the contents of every file—and we have no cavil with this general proposition—then everything the government chooses to seize will, under this theory, automatically come into plain view. Since the government agents ultimately decide how much to actually take, this will create a powerful incentive for them to seize more rather than less: Why stop at the list of all baseball players when you can seize the entire Tracey Directory? Why just that directory and not the entire hard drive? Why just this computer and not the one in the next room and the next room after that? Can't find the computer? Seize the Zip disks under the bed in the room where the computer once might have been. *See United States* v. *Hill*, 322 F. Supp. 2d 1081 (C.D. Cal. 2004). Let's take everything back to the lab, have a good look around and see what we might stumble upon.

**[7]** This would make a mockery of *Tamura* and render the carefully crafted safeguards in the Central District warrant a nullity. All three judges below rejected this construction, and with good reason. One phrase in the warrant cannot be read as eviscerating the other parts, which would be the result if the "otherwise legally seized" language were read to permit the government to keep anything one of its agents happened to see while performing a forensic analysis of a hard drive. The phrase is more plausibly construed as referring to any evidence that the government is entitled to retain entirely independent of this seizure. The government had no such independent basis to retain the test results of other than the ten players specified in the warrant.

## B.  Initial Review by Computer Personnel

**[8]** The government also failed to comply with another important procedure specified in the warrant, namely that

"computer personnel" conduct the initial review of the seized data and segregate materials not the object of the warrant for return to their owner. As noted, Judge Cooper found that these procedures were completely ignored; rather, the case agent immediately rooted out information pertaining to *all* professional baseball players and used it to generate additional warrants and subpoenas to advance the investigation. Judge Illston found the same. The record reflects no forensic lab analysis, no defusing of booby traps, no decryption, no cracking of passwords and certainly no effort by a dedicated computer specialist to separate data for which the government had probable cause from everything else in the Tracey Directory. Instead, as soon as the Tracey Directory was extracted from the CDT computers, the case agent assumed control over it, examined the list of all professional baseball players and extracted the names of those who had tested positive for steroids. *See Comprehensive Drug Testing*, 513 F.3d at 1134-35 (Thomas, J., dissenting). Indeed, the government admitted at the hearing before Judge Mahan that "the idea behind taking [the copy of the Tracey Directory] was to take it and later on briefly peruse it to see if there was anything above and beyond that which was authorized for seizure in the initial warrant." The government agents obviously were counting on the search to bring constitutionally protected data into the plain view of the investigating agents.

But it was wholly unnecessary for the case agent to view any data for which the government did not already have probable cause because there was an agent at the scene who was specially trained in computer forensics. This agent did make an initial determination that the CDT computer containing the Tracey Directory could not be searched and segregated on-site, and that it would be safe to copy the Tracey Directory, rather than seizing the entire hard drive or computer. After that copy was made, however, it was turned over to the case agent, and the specialist did nothing further to segregate the target data from that which was swept up simply because it was nearby or commingled. The sequence of events supports

the suspicion that representations in the warrant about the necessity for broad authority to seize materials were designed to give the government access to the full list of professional baseball players and their confidential drug testing records.

The government argues that it didn't violate the warrant protocol because the warrant didn't specify that *only* computer personnel could examine the seized files, and the case agent was therefore entitled to view them alongside the computer specialist. This, once again, is sophistry. It would make no sense to represent that computer personnel would be used to segregate data if investigatory personnel were also going to access all the data seized. What would be the point? The government doesn't need instruction from the court as to what kind of employees to use to serve its own purposes; the representation in the warrant that computer personnel would be used to examine and segregate the data was obviously designed to reassure the issuing magistrate that the government wouldn't sweep up large quantities of data in the hope of dredging up information it could not otherwise lawfully seize. Judge Cooper found that the government utterly failed to follow the warrant's protocol. Judge Illston also found that the government's seizure, in callous disregard of the Fourth Amendment, reached information clearly not covered by a warrant. These findings are binding on the government, but simple common sense leads to precisely the same conclusion: This was an obvious case of deliberate overreaching by the government in an effort to seize data as to which it lacked probable cause.

## C.  Federal Rule of Criminal Procedure 41(g)

**[9]** Judge Mahan cured this overreaching by ordering the government to return the illegally seized data. We have long held that Rule 41(g) empowers district courts to do just that. *Ramsden* v. *United States*, 2 F.3d 322 (9th Cir. 1993). Though styled as a motion under a Federal Rule of Criminal Procedure, when the motion is made by a party against whom no

criminal charges have been brought, such a motion is in fact a petition that the district court invoke its civil equitable jurisdiction. *Id.* at 324. We agree with the panel that the district court in this case did not abuse its discretion in choosing to exercise that jurisdiction. *Comprehensive Drug Testing*, 513 F.3d at 1104.

The government argues that Rule 41(g) is inapplicable because it is not designed to be used as a suppression motion. But CDT and the Players Association are not seeking to have evidence suppressed, as they are not criminal defendants. Rather, by forcing the government to return property that it had not properly seized, CDT is preserving the integrity of its business and the Players Association is protecting the privacy and economic well-being of its members, which could easily be impaired if the government were to release the test results swept up in the dragnet.

Judge Ikuta's dissent overlooks the crucial distinction between a motion to suppress and a motion for return of property: The former is limited by the exclusionary rule, the latter is not. In *United States* v. *Calandra*, 414 U.S. 338, 348 n.6 (1974), and *United States* v. *Payner*, 447 U.S. 727, 728, 735-36 & n.7 (1980), the Court addressed the suppression, not the return, of seized materials—a detail perhaps obscured because the version of Rule 41 then in existence addressed motions to suppress and motions to return in the same subsection. Lest there be any doubt that these are only suppression cases, note that *Calandra* used the availability of a motion to return, among other remedies, as a reason the exclusionary rule need not apply to grand jury proceedings. *See* 414 U.S. at 354 n.10. *Payner*, which never mentions Rule 41 or a motion to return, simply held that "the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court." 447 U.S. at 735. This rule has no relevance here because no motion to suppress, whether based on Rule 41(h) or the supervisory power, is before us.

That Rule 41(g) is broader than the exclusionary rule can no longer be in doubt in light of the 1989 amendments which explicitly authorize a motion to return property on behalf of any "person aggrieved by an unlawful search and seizure of property *or by the deprivation of property*." Fed. R. Crim. P. 41(g) (emphasis added). This language was designed to expand the rule's coverage to include property lawfully seized. *See id.* advisory committee notes. It goes without saying that lawfully seized evidence may not be suppressed.

The return of seized property under Rule 41(g) and the exclusionary rule serve fundamentally different purposes. Suppression helps ensure that law enforcement personnel adhere to constitutional norms by denying them, and the government they serve, the benefit of property that is unlawfully seized. Rule 41(g) is concerned with those whose property or privacy interests are impaired by the seizure. Suppression applies only to criminal defendants whereas the class of those aggrieved can be, as this case illustrates, much broader.

Most importantly, judicially-imposed restrictions on the scope of the exclusionary rule—itself a judicially-created remedy—are not applicable to orders for return of property which derive their authority from the Federal Rules of Criminal Procedure and their enabling legislation. This is not, in any event, a question properly presented in the case now before us: What uses the government may make of the Quest evidence during a criminal proceeding must be decided in the context of such a proceeding, when and if criminal charges are brought against any of the players.

Under *Ramsden*, the district court is required to balance four discretionary factors to determine whether to allow the government to retain the property, order it returned or (as happened in *Ramsden*) craft a compromise solution that seeks to accommodate the interests of all parties. The Players Association is (1) plainly aggrieved by the deprivation, Fed. R. Crim. P. Rule 41(g), and (2) likely to suffer irreparable injury if it's

not returned. And as the three judge panel recognized, the government has conceded (3) the lack of an adequate remedy at law. *Comprehensive Drug Testing*, 513 F.3d at 1103.

**[10]** Judge Ikuta is thus mistaken when she suggests that the Players Association is not entitled to bring the 41(g) motion because it lacks a property interest in the urine samples and other bodily fluids. Ikuta dissent at 13391-92 n.2. The rule nowhere speaks of an ownership interest; rather, by its plain terms, it authorizes anyone aggrieved by a deprivation of property to seek its return. Here, the Players Association is aggrieved by the seizure as the removal of the specimens and documents breaches its negotiated agreement for confidentiality, violates its members' privacy interests and interferes with the operation of its business. *Cf. NAACP* v. *Alabama ex rel. Patterson*, 357 U.S. 449, 458-60 (1958). In any event, we are again bound by the preclusive effect of the Illston and Cooper orders.

The only *Ramsden* factor fairly in dispute is (4) whether the government showed a callous disregard for the rights of third parties. Judge Mahan concluded that it did—as did every other district judge who examined the question. There is ample evidence to support this determination, even if the government were not bound by that same finding in the Cooper and Illston Orders. As a factual finding, we review such a determination only for clear error. *SEC* v. *Coldicutt*, 258 F.3d 939, 941 (9th Cir. 2001). We find none here.

**[11]** Contrary to our dissenting colleagues' view of the matter, Ikuta dissent at 13391-95, Rule 41(g) does indeed contemplate that district judges may order the return of the originals, as well as any copies, of seized evidence: "In some circumstances, however, equitable considerations might justify an order requiring the government to return or destroy all copies of records that it has seized." Fed. R. Crim. P. 41 advisory committee notes (1989 amendments). What circumstances merit this remedy is left to the discretion of the district

court in the first instance, and our review of this issue is limited by the Illston Order's preclusive effect.

**[12]** Apart from preclusion, however, we cannot see how Judge Mahan abused his discretion by concluding that "equitable considerations" required sequestration and the return of copies. The risk to the players associated with disclosure, and with that the ability of the Players Association to obtain voluntary compliance with drug testing from its members in the future, is very high. Indeed, some players appear to have already suffered this very harm as a result of the government's seizure. *See, e.g.*, Michael S. Schmidt, *Ortiz and Ramirez Said to Be on 2003 Doping List*, N.Y. Times, July 31, 2009, at A1; Michael S. Schmidt, *Sosa Is Said to Have Tested Positive in 2003*, N.Y. Times, June 17, 2009, at B11; Michael S. Schmidt, *Rodriguez Said to Test Positive in 2003*, N.Y. Times, February 8, 2009, at A1. Judge Mahan certainly did not abuse his broad discretion in balancing these equities.

**[13]** We affirm Judge Mahan on an alternative ground as well: When, as here, the government comes into possession of evidence by circumventing or willfully disregarding limitations in a search warrant, it must not be allowed to benefit from its own wrongdoing by retaining the wrongfully obtained evidence or any fruits thereof. When the district court determines that the government has obtained the evidence through intentional wrongdoing—rather than through a technical or good faith mistake—it should order return of the property without the need for balancing that is applicable in the more ordinary case.

## 3. The Illston Quashal

Judge Illston quashed the government's final subpoena under Federal Rule of Criminal Procedure 17(c), which authorizes quashal if compliance would be "unreasonable or oppressive." Determining whether this standard is met is committed to the district judge's discretion, and we will reverse

only if that discretion has been abused. *In re Grand Jury Proceedings*, 13 F.3d 1293, 1295 (9th Cir. 1994) (per curiam).

Judge Illston quashed the subpoena after both the Cooper and Mahan Orders. Judge Illston described the subpoena as "served after the government had obtained evidence . . . which has been determined now to have been illegally seized." Under the circumstances, Judge Illston regarded the subpoena as an unreasonable "insurance policy"—having seized materials unlawfully, the government then subpoenaed the very same materials in an attempt to moot any future proceedings for a return of property. *Cf. J.B. Manning Corp.* v. *United States*, 86 F.3d 926 (9th Cir. 1996).

**[14]** It isn't per se unreasonable to conduct an investigation using both search warrants and subpoenas. *E.g.*, *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 851-55 (9th Cir. 1991). But the presence of substantial government misconduct and unlawful seizure of evidence (which was absent from *In re Grand Jury Subpoenas*) is quite properly taken into account when determining whether a subpoena is unreasonable. Moreover, Judge Illston found that the government's entire course of conduct had been intended to prevent the Players Association and CDT from litigating the legality of the original subpoenas. This, too, is a valid consideration in evaluating quashal.

**[15]** For us to reverse a decision as an abuse of discretion, we must have "a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached." *Coldicutt*, 258 F.3d at 941. That standard—difficult to meet under any circumstances—cannot possibly be satisfied here, in light of Judge Cooper's preclusive findings and Judge Mahan's well-reasoned order. We therefore affirm the Illston Quashal. In doing so, we emphasize that, while the government is free to pursue warrants, subpoenas and other investigatory tools, and may do so in whichever judicial district is appropriate in light of the location of the

information sought, it must fully disclose to each judicial officer prior efforts in other judicial fora to obtain the same or related information, and what those efforts have achieved. This is no more than we require of, for example, a prisoner seeking to file a second or successive habeas petition.

More than one of the judges involved in this case below commented that they felt misled or manipulated by the government's apparent strategy of moving from district to district and judicial officer to judicial officer in pursuit of the same information, and without fully disclosing its efforts elsewhere. The cause of justice will best be served if such judicial reactions to the government's conduct can be avoided in the future.

## Concluding Thoughts

This case well illustrates both the challenges faced by modern law enforcement in retrieving information it needs to pursue and prosecute wrongdoers, and the threat to the privacy of innocent parties from a vigorous criminal investigation. At the time of *Tamura*, most individuals and enterprises kept records in their file cabinets or similar physical facilities. Today, the same kind of data is usually stored electronically, often far from the premises. Electronic storage facilities intermingle data, making them difficult to retrieve without a thorough understanding of the filing and classification systems used—something that can often only be determined by closely analyzing the data in a controlled environment. *Tamura* involved a few dozen boxes and was considered a broad seizure; but even inexpensive electronic storage media today can store the equivalent of millions of pages of information.

Wrongdoers and their collaborators have obvious incentives to make data difficult to find, but parties involved in lawful activities may also encrypt or compress data for entirely legitimate reasons: protection of privacy, preservation of privileged communications, warding off industrial espio-

United States v. Comprehensive Drug Testing, Inc. 13959

nage or preventing general mischief such as identity theft. Law enforcement today thus has a far more difficult, exacting and sensitive task in pursuing evidence of criminal activities than even in the relatively recent past. The legitimate need to scoop up large quantities of data, and sift through it carefully for concealed or disguised pieces of evidence, is one we've often recognized. *See, e.g.*, *United States* v. *Hill*, 459 F.3d 966 (9th Cir. 2006).

This pressing need of law enforcement for broad authorization to examine electronic records, so persuasively demonstrated in the introduction to the original warrant in this case, *see* pp. 13944-45 *supra*, creates a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant. The problem can be stated very simply: There is no way to be sure exactly what an electronic file contains without somehow examining its contents—either by opening it and looking, using specialized forensic software, keyword searching or some other such technique. But electronic files are generally found on media that also contain thousands or millions of other files among which the sought-after data may be stored or concealed. By necessity, government efforts to locate particular files will require examining a great many other files to exclude the possibility that the sought-after data are concealed there.

Once a file is examined, however, the government may claim (as it did in this case) that its contents are in plain view and, if incriminating, the government can keep it. Authorization to search *some* computer files therefore automatically becomes authorization to search all files in the same subdirectory, and all files in an enveloping directory, a neighboring hard drive, a nearby computer or nearby storage media. Where computers are not near each other, but are connected electronically, the original search might justify examining files in computers many miles away, on a theory that incrimi-

nating electronic data could have been shuttled and concealed there.

The advent of fast, cheap networking has made it possible to store information at remote third-party locations, where it is intermingled with that of other users. For example, many people no longer keep their email primarily on their personal computer, and instead use a web-based email provider, which stores their messages along with billions of messages from and to millions of other people. Similar services exist for photographs, slide shows, computer code and many other types of data. As a result, people now have personal data that are stored with that of innumerable strangers. Seizure of, for example, Google's email servers to look for a few incriminating messages could jeopardize the privacy of millions.

It's no answer to suggest, as did the majority of the three-judge panel, that people can avoid these hazards by not storing their data electronically. To begin with, the choice about how information is stored is often made by someone other than the individuals whose privacy would be invaded by the search. Most people have no idea whether their doctor, lawyer or accountant maintains records in paper or electronic format, whether they are stored on the premises or on a server farm in Rancho Cucamonga, whether they are commingled with those of many other professionals or kept entirely separate. Here, for example, the Tracey Directory contained a huge number of drug testing records, not only of the ten players for whom the government had probable cause but hundreds of other professional baseball players, thirteen other sports organizations, three unrelated sporting competitions, and a non-sports business entity—thousands of files in all, reflecting the test results of an unknown number of people, most having no relationship to professional baseball except that they had the bad luck of having their test results stored on the same computer as the baseball players.

Second, there are very important benefits to storing data electronically. Being able to back up the data and avoid the

loss by fire, flood or earthquake is one of them. Ease of access from remote locations while traveling is another. The ability to swiftly share the data among professionals, such as sending MRIs for examination by a cancer specialist half-way around the world, can mean the difference between death and a full recovery. Electronic storage and transmission of data is no longer a peculiarity or a luxury of the very rich; it's a way of life. Government intrusions into large private databases thus have the potential to expose exceedingly sensitive information about countless individuals not implicated in any criminal activity, who might not even know that the information about them has been seized and thus can do nothing to protect their privacy.

It is not surprising, then, that all three of the district judges below were severely troubled by the government's conduct in this case. Judge Mahan, for example, asked "what ever happened to the Fourth Amendment? Was it . . . repealed somehow?" Judge Cooper referred to "the image of quickly and skillfully moving the cup so no one can find the pea." And Judge Illston regarded the government's tactics as "unreasonable" and found that they constituted "harassment." Judge Thomas, too, in his panel dissent, expressed frustration with the government's conduct and position, calling it a "breathtaking expansion of the 'plain view' doctrine, which clearly has no application to intermingled private electronic data." *Comprehensive Drug Testing*, 513 F.3d at 1117.

Everyone's interests are best served if there are clear rules to follow that strike a fair balance between the legitimate needs of law enforcement and the right of individuals and enterprises to the privacy that is at the heart of the Fourth Amendment. *Tamura* has provided a workable framework for almost three decades, and might well have sufficed in this case had its teachings been followed. We have updated *Tamura* to apply to the daunting realities of electronic searches.

We recognize the reality that over-seizing is an inherent part of the electronic search process and proceed on the assumption that, when it comes to the seizure of electronic records, this will be far more common than in the days of paper records. This calls for greater vigilance on the part of judicial officers in striking the right balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures. The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect.

\* \* \*

The appeal in No. 05-55354 (the Cooper Order) is dismissed as untimely.

The judgments in Nos. 05-15006 (the Mahan Order) and 05-10067 (the Illston Quashal) are affirmed.

---

Chief Judge KOZINSKI, with whom Judges KLEINFELD, W. FLETCHER, PAEZ and M. SMITH join, concurring:

The opinion correctly disposes of the Fourth Amendment issues in this case, so I join it in full. I write separately because these issues are important and likely often to arise again. It would therefore be useful to provide guidance about how to deal with searches of electronically stored data in the future so that the public, the government and the courts of our circuit can be confident such searches and seizures are conducted lawfully. The guidance below offers the government a safe harbor, while protecting the people's right to privacy and property in their papers and effects. District and magistrate judges must exercise their independent judgment in every case, but heeding this guidance will significantly increase the

likelihood that the searches and seizures of electronic storage that they authorize will be deemed reasonable and lawful.

\* \* \*

When the government wishes to obtain a warrant to examine a computer hard drive or electronic storage medium to search for certain incriminating files, or when a search for evidence could result in the seizure of a computer, *see, e.g.*, *United States* v. *Giberson*, 527 F.3d 882 (9th Cir. 2008), magistrate judges should insist that the government forswear reliance on the plain view doctrine. They should also require the government to forswear reliance on any similar doctrine that would allow retention of data obtained only because the government was required to segregate seizable from non-seizable data. This will ensure that future searches of electronic records do not "make a mockery of *Tamura*"—indeed, the Fourth Amendment—by turning all warrants for digital data into general warrants. Maj. op. at 13950. If the government doesn't consent to such a waiver, the magistrate judge should order that the seizable and non-seizable data be separated by an independent third party under the supervision of the court, or deny the warrant altogether.

In addition, while it's perfectly appropriate for a warrant application to acquaint the issuing judicial officer with the theoretical risks of concealment and destruction of evidence, the government should also fairly disclose the *actual* degree of such risks in the case presented to the judicial officer. In this case, for example, the warrant application presented to Judge Johnson discussed the numerous theoretical risks that the data might be destroyed, but failed to mention that Comprehensive Drug Testing had agreed to keep the data intact until its motion to quash the subpoena could be ruled on by the Northern California district court, and that the United States Attorney's Office had accepted this representation. This omission created the false impression that, unless the data were seized at once, it would be lost. *Comprehensive*

*Drug Testing*, 513 F.3d at 1132 (Thomas, J., dissenting). Such pledges of data retention are obviously highly relevant in determining whether a warrant is needed at all and, if so, what its scope should be. If the government believes such pledges to be unreliable, it may say so and explain why. But omitting such highly relevant information altogether is inconsistent with the government's duty of candor in presenting a warrant application. A lack of candor in this or any other aspect of the warrant application must bear heavily against the government in the calculus of any subsequent motion to return or suppress the seized data.

The process of sorting, segregating, decoding and otherwise separating seizable data (as defined by the warrant) from all other data should also be designed to achieve that purpose and that purpose only. Thus, if the government is allowed to seize information pertaining to ten names, the search protocol should be designed to discover data pertaining to those names only, not to others, and not those pertaining to other illegality. For example, the government has sophisticated hashing tools at its disposal that allow the identification of well-known illegal files (such as child pornography) without actually opening the files themselves. These and similar search tools should not be used without specific authorization in the warrant, and such permission should only be given if there is probable cause to believe that such files can be found on the electronic medium to be seized.

To that end, the warrant application should normally include, or the issuing judicial officer should insert, a protocol for preventing agents involved in the investigation from examining or retaining any data other than that for which probable cause is shown. The procedure might involve, as in this case, a requirement that the segregation be done by specially trained computer personnel who are not involved in the investigation. In that case, it should be made clear that *only* those personnel may examine and segregate the data. The government should also agree that such computer personnel

will not communicate any information they learn during the segregation process absent further approval of the court.

At the discretion of the issuing judicial officer, and depending on the nature and sensitivity of the privacy interests involved, the computer personnel in question may be government employees or independent third parties not affiliated with the government. In a case such as this one, where the party subject to the warrant is not suspected of any crime, and where the privacy interests of numerous other parties who are not under suspicion of criminal wrongdoing are implicated by the search, the presumption should be that the segregation of the data will be conducted by an independent third party selected by the court. That third party should be prohibited from communicating any information learned during the search other than that covered by the warrant.

Once the data has been segregated (and, if necessary, redacted), the government agents involved in the investigation should be allowed to examine only the information covered by the terms of the warrant. Absent further judicial authorization, any remaining copies should be destroyed or, at least so long as they may be lawfully possessed by the party from whom they were seized, returned along with the actual physical medium that may have been seized (such as a hard drive or computer). The government should not retain copies of such returned data unless it obtains specific judicial authorization to do so.

Also, within a time specified in the warrant, which should be as soon as practicable, the government should provide the issuing officer with a return disclosing precisely what it has obtained as a consequence of the search, and what it has returned to the party from whom it was seized. The return should include a sworn certificate that the government has destroyed or returned all copies of data that it's not entitled to keep. If the government believes it's entitled to retain data as to which no probable cause was shown in the original war-

rant, it may seek a new warrant or justify the warrantless seizure by some means other than plain view.

This guidance can be summed up as follows:

**1.** Magistrate judges should insist that the government waive reliance upon the plain view doctrine in digital evidence cases. Pp. 13962-63 *supra*; *see* maj. op. at 13949-50.

**2.** Segregation and redaction of electronic data must be done either by specialized personnel or an independent third party. Pp. 13964-65 *supra*; *see* maj. op. at 13945-48, 13950-52. If the segregation is to be done by government computer personnel, the government must agree in the warrant application that the computer personnel will not disclose to the investigators any information other than that which is the target of the warrant.

**3.** Warrants and subpoenas must disclose the actual risks of destruction of information as well as prior efforts to seize that information in other judicial fora. Pp. 13963-64 *supra*; *see* maj. op. at 13944-45, 13957-58.

**4.** The government's search protocol must be designed to uncover only the information for which it has probable cause, and only that information may be examined by the case agents. Pp. 13964-65 *supra*; *see* maj. op. at 13950-52.

**5.** The government must destroy or, if the recipient may lawfully possess it, return non-responsive data, keeping the issuing magistrate informed about when it has done so and what it has kept. P. 13965 *supra*; *see* maj. op. at 13952-56.

\* \* \*

This guidance is hardly revolutionary. It's essentially *Tamura*'s solution to the problem of necessary over-seizing of evidence. Just as *Tamura* has served as a guidepost for dec-

ades, the procedures outlined above should prove a useful tool for the future. Nothing any appellate court could say, however, would substitute for the sound judgment that magistrate judges must and, I am confident will, exercise in striking this delicate balance.

---

BEA, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's result, based on its analysis of the issues presented in this case, as applied to this case only.[1] The government failed to follow either the procedures of *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), or those outlined in the approved warrant, which would have required the government to conduct its search of the seized intermingled computer files by using computer technicians not case investigators.

Further, I would affirm the Cooper, Mahan, and Illston orders because the seized names at issue were not in "plain view" when seized. The plain view doctrine requires evidence of illegality to be "immediately apparent" to the searching investigator. *Horton v. California*, 496 U.S. 128, 139-140 (1990). Here, the portion of the spreadsheet (located within the "Tracey" directory) that contained the drug testing results, contained both the names of the ten ballplayers who were the subjects of the warrant and the names of many other ballplayers, the records of whom the government did not have probable cause to search and seize. The spreadsheet did not, however, initially display on the agent's computer screen the *results* of steroid testing as to the other ballplayers. To see the spreadsheet column containing the results of the tests of the

---

[1] I agree, however, with Judge Callahan and Judge Ikuta that the later-filed Cooper Order does not have preclusive effect on the earlier-filed Mahan Order. That said, the majority reaches the correct result in this case even if the Cooper order is not given preclusive effect.

other ballplayers, the agent had to scroll to his right on the spreadsheet, onto another screen. However, once he scrolled to the right, the agent could see not only the testing results for the targeted ten, but also the results for all of the other ballplayers whose results were listed on the spreadsheet.

A valid "plain view" seizure of items that are truly "immediately apparent" would have required the agent to display only the testing results for the ballplayers for whom he had a warrant, and seize only evidence of additional illegality if such evidence is "immediately apparent" as part of the *segregated* results for those ballplayers. For instance, the agent could have selected the spreadsheet rows for the ten ballplayers for whom he had a warrant, then copied and pasted those rows into a blank spreadsheet.[2] If he had done so, he would

---

[2]The record reveals the spreadsheet was in Microsoft Excel format. Agent Novitsky viewed the spreadsheet on or about April 8, 2004. By that time, Microsoft Excel was the most widely used spreadsheet application available for Microsoft Windows and Mac OS X operating systems. *See* http://en.wikipedia.org/wiki/Microsoft_Excel. Microsoft Excel became commercially available in 1985, and currently sells for $229 retail. *See* http://office.microsoft.com/en-us/excel/FX102464391033.aspx.

In Microsoft Excel, to avoid scrolling to the right and viewing the results column for all of the ballplayers instead of just for the targeted ten, all Agent Novitsky had to do was the following: While depressing and holding the Control key, he would click on the numbers on the left side of the spreadsheet that corresponded to the rows that contain the names of the targeted ballplayers. The rows containing those ballplayers' names would become highlighted. Novitsky would then release the Control key. He would next go to the top of the screen, click on the "Edit" menu, and choose "Copy." Then, he would click on the "File" menu at the top of the screen, and choose "New Blank Workbook." When the new blank spreadsheet appeared on the screen, he would click on the "Edit" menu in the new blank spreadsheet and choose "Paste." The rows of the ten targeted ballplayers selected in the original spreadsheet *and only those rows*— would appear in the new spreadsheet. Novitsky would then scroll to the right in the new blank spreadsheet and would see only the test results for the targeted ballplayers for whom he had probable cause to search and seize.

have seen only those drug testing results for which he had a warrant.

However, as the government conceded at oral argument before Judge Mahan, rather than limiting the scope of his search in any way, or seizing only that evidence of illegality "immediately apparent" on the first screen he called up, Agent Novitsky intentionally and volitionally scrolled right on the spreadsheet, without first having segregated only the responsive data, "to see if there was anything above and beyond that which was authorized for seizure in the initial warrant." This demonstrates the seized evidence of illegality was not "immediately apparent" or in "plain view."

Thus, I agree with the majority and vote to affirm the district courts' orders. I write separately, however, because the majority's opinion goes beyond the current case or controversy in two respects.

## I.

The majority affirms the Mahan Order finding Judge Mahan did not abuse his discretion in deciding the evidence seized by the government must be sequestered and returned because the balance of the equities favored Comprehensive Drug Testing. With that portion of the opinion, I concur. The majority holds further, as an alternative ground on which to affirm Judge Mahan's order, that the fact that the government deliberately disregarded the terms of the search warrant when it executed its search compelled Judge Mahan to order the sequestration and return of the evidence. Majority Op. at 13956. I cannot concur with that alternative ground because it is unnecessary to the majority's decision; our court should affirm only on the ground Judge Mahan correctly balanced the equities.

Furthermore, the rule that the government's deliberate disregard of the terms of a search warrant is *by itself* sufficient

to order the return of evidence is unnecessarily broad. Under *Ramsden v. United States*, whether the government acted in willful disregard of the limits of a search warrant is just one factor in a four factor analysis. 2 F.3d 322, 325 (9th Cir. 1993). The majority transforms that one factor of the balancing test into a dispositive issue. *See* Majority Op. at 13956-57. The *Ramsden* factors have been sufficient to govern motions for the return of property for nearly two decades and the majority does not explain the rationale for modifying that rule in this case.

There may be cases where the government did show willful disregard of the terms of the search warrant, but the motion for the return of evidence should nonetheless be denied. For example, when a movant cannot prove he will be irreparably harmed if the seized property is not returned—the second element of the *Ramsden* inquiry—then it seems the district court should not return the evidence merely because the government obtained the evidence through intentional wrongdoing. An example would be images of child pornography, which is always "contraband," possession of which is criminal. *See United States v. Mack*, 164 F.3d 467, 473 (9th Cir. 1999). Instead, the district court should balance the equities to determine whether sequestration and return of the evidence is necessary, based on the specific facts of the case presented.

## II.

The majority affirms because Judge Illston did not abuse her discretion in quashing the subpoenas sought by the government after the Cooper and Mahan Orders were filed. I agree and would affirm on that ground as well.

The majority then holds that whenever the government seeks a subpoena, it "must fully disclose to each judicial officer prior efforts in other judicial fora to obtain the same or related information, and what those efforts have achieved." Majority Op. at 13958. Although I imagine such disclosure is

generally a good practice for the government to follow, I do not see why such a practice should have the force of law. If it is good policy, its adoption should be decided by Congress or the Executive as the policy-making branches of our government. This new requirement is simply not necessary to the decision.

The majority supports this new requirement by stating: "This is no more than we require of, for example, a prisoner seeking to file a second or successive habeas petition." *Id.* This analogy to habeas petitions does not hold up to scrutiny. Congress enacted the requirement that habeas petitioners disclose their prior petitions so the burden on the courts of excessive petitions would be lightened. *See* 28 U.S.C. § 2244(b)(3)(A) (Revision Notes and Legislative Reports, 1948 Acts). Here, the majority imposes a similar requirement to protect owners of property and defendants in criminal cases, not to improve judicial efficiency.

## III.

Finally, I do not join Chief Judge Kozinski's concurrence because it is advisory and unnecessary to the current case and controversy. It would be nice to give magistrates clear "guidance" when possible. But that is true in all cases, and yet we still approach that goal by issuing rulings on the cases and controversies properly before us, and nothing more.

---

CALLAHAN, Circuit Judge, with whom IKUTA, Circuit Judge, joins, concurring in part and dissenting in part from the en banc panel's per curiam opinion:

I initially express my concerns with the proposed guidelines for searches of electronically stored data that are set forth in the Chief Judge's concurring opinion. The concurrence is not joined by a majority of the en banc panel and

accordingly the suggested guidelines are not Ninth Circuit law. Nonetheless, although they are only suggestions, there are sound reasons for declining to follow them. In Section B of this dissent, I reiterate my objections to the majority's opinion as set forth in my concurring and dissenting opinion to Chief Judge Kozinski's initial opinion for the majority of the en banc panel. *United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989 (9th Cir. 2009) (en banc).

### A.

As noted in my dissent from our initial en banc opinion, the breadth of the proposed guidelines for future digital evidence cases raises several serious concerns. Although I appreciate the desire to set forth a new framework with respect to searches of commingled electronic data, I remain wary of this prophylactic approach. The prescriptions go significantly beyond what is necessary to resolve this case.

Furthermore, the proffered "guidelines" are troubling because they are over-broad, unreasonably restrictive of how law enforcement personnel carry out their work, and unsupported by citations to legal authority. For example, the concurring opinion does not explain why it is now appropriate to grant heightened Fourth Amendment protections in the context of searches of computers based on the nature of the technology involved when we have previously cautioned just the opposite. *See United Sates v. Giberson*, 527 F.3d 882, 887-88 (9th Cir. 2008) (declining to impose heightened Fourth Amendment protections in computer search cases as a result of a computer's ability to store large amounts of potentially intermingled information, and stating that such heightened protections must be "based on a principle that is not technology-specific").

The concurring opinion also fails to acknowledge that its proffered guidance conflicts with the amendments to Federal Rule of Criminal Procedure 41(f)(1)(B), effective December

1, 2009. For instance, Rule 41(f)(1)(B) now states that in cases where an officer is seizing or copying electronically stored information, "[t]he officer may retain a copy of the electronically stored information that was seized or copied." This provision directly contradicts the suggestion that "[t]he government should not retain copies of such returned data." Conc. Op. at 13965. Similarly, Rule 41(f)(1)(B) now provides that "[i]n a case involving the seizure of electronic storage media or the seizure or copying of electronically stored information, the inventory may be limited to describing the physical storage media that were seized or copied." The concurring opinion, however, suggests that "the government should provide the issuing officer with a return disclosing precisely what it has obtained as a consequence of the search, and what it has returned to the party from whom it was seized." Conc. Op. at 13965. Presumably these suggestions are superseded by the detailed amendments to Rule 41, which provide comprehensive guidance in this area.

In addition, the suggested protocols essentially jettison the plain view doctrine in digital evidence cases, urging that magistrate judges "insist that the government waive reliance upon the plain view doctrine in digital evidence cases."[1] Conc. Op. at 13963. This is put forth without explaining why the Supreme Court's case law or our case law dictates or even suggests that the plain view doctrine should be entirely abandoned in digital evidence cases. Instead of tailoring its analysis of the plain view doctrine to the facts of this case, the concurring opinion takes the bold, and unnecessary step of casting that doctrine aside. The more prudent course would be to allow the contours of the plain view doctrine to develop incrementally through the normal course of fact-based case

---

[1]Although the suggestion is framed in terms of what a magistrate "should insist," the practical effect of this proposal — were it to be adopted as law — would be to prescribe a mandatory procedure. The creation of a "safe harbor" (Conc. Op. at 13962), implicitly warns judges and lawyers of the perils of any other approach.

adjudication. A measured approach based on the facts of a particular case is especially warranted in the case of computer-related technology, which is constantly and quickly evolving.

Moreover, the concurring opinion offers no legal authority for its proposal requiring the segregation of computer data by specialized personnel or an independent third party. *See* Conc. Op. at 13964-65, 13966. Also, the proposed *ex ante* restriction on law enforcement investigations raises practical, cost-related concerns. With respect to using an in-house computer specialist to segregate data, the suggestion essentially would require that law enforcement agencies keep a "walled-off," non-investigatory computer specialist on staff for use in searches of digital evidence. To comply, an agency would have to expand its personnel, likely at a significant cost, to include both computer specialists who could segregate data and forensic computer specialists who could assist in the subsequent investigation. The alternative would be to use an independent third party consultant, which no doubt carries its own significant expense. Both of these options would force law enforcement agencies to incur great expense, perhaps a crushing expense for a smaller police department that already faces tremendous budget pressures.

In sum, although the suggestions are well-intentioned, they certainly are not legally compelled and their adoption would create more problems than it would solve. Certainly the Chief Judge and my colleagues who have joined his concurring opinion may express their opinions on future protocols; however, their suggestions should not be confused with the en banc court's opinion which, although I dissent from it, is properly confined to the issues required to decide the appeal.

### B.

I agree with the majority that the government's appeal from

United States v. Comprehensive Drug Testing, Inc. 13975

the Cooper Order[2] was untimely and that the appeal in case number 05-55354 should be dismissed. I disagree, however, with the majority's conclusion that the findings stated in the Cooper Order or the Illston Order have dispositive preclusive effect with respect to this court's review of the Mahan Order. Setting aside the Cooper Order and the Illston Order, I would reverse the Mahan Order on the merits. In addition, I would vacate and remand the Illston Quashal. Accordingly, I respectfully dissent, in part, from the per curiam opinion.

## I.

The majority holds that with respect to this court's review of the findings and conclusions stated in the Mahan Order, the government is bound by the factual and legal determinations contained in the Cooper Order and the Illston Order. P.C. Op. at 13948. Based on the collateral estoppel or issue preclusive effect of these orders, the majority upholds Judge Mahan's findings that " '[t]he government callously disregarded the affected players' constitutional rights," and that it "unreasonab[ly] . . . refuse[d] to follow the procedures set forth in *United States* v. *Tamura* . . . upon learning that drug-testing records for the ten athletes named in the original April 8 warrants executed at Quest and at [Comprehensive Drug Testing ("CDT")] were intermingled with records for other athletes not named in those warrants.' " *Id*. at 13949 (internal quotation marks omitted, alterations in original). Neither the Cooper Order nor the Illston Order has preclusive effect over our review of the Mahan Order, and I address each order in turn.

I disagree that the Cooper Order has preclusive effect with respect to the Mahan Order. The problem is a temporal one—the Cooper Order, entered October 1, 2004, does not have preclusive effect over this court's review of the Mahan

---

[2]For ease of reference, I adopt the majority's definition conventions as to the orders referred to in the majority opinion: the Cooper Order, the Mahan Order, the Illston Order, and the Illston Quashal.

13976 UNITED STATES V. COMPREHENSIVE DRUG TESTING, INC.

Order because it was entered *after* the Mahan Order, which was entered September 7, 2004.

The single case that the majority relies on for its application of the issue preclusion doctrine, *Steen v. John Hancock Mutual Life Insurance Co.*, addressed whether issues decided in an earlier decision had a preclusive effect in a subsequent decision. *See* 106 F.3d 904, 908-09 (9th Cir. 1997). *Steen* does not support the proposition that a later-in-time order has a retroactive preclusive effect on an earlier one.[3] Although this case presents a peculiar backdrop for the application of the issue preclusion doctrine, our decision in *Nationwide Mutual Insurance Company v. Liberatore*, 408 F.3d 1158 (9th Cir. 2005), is instructive. Liberatore was a member of the U.S. Navy who was traveling on orders and picked up his friend, Ivey, for a social evening during his trip. Liberatore drank and drove, causing a traffic accident in which Ivey suffered serious injuries. The accident resulted in two lawsuits: (1) Ivey's negligence action against Liberatore, the rental car company, and the United States; and (2) a declaratory relief action by Nationwide, Liberatore's insurance company, against Liberatore, the United States, the rental car company, and Ivey. In Ivey's negligence lawsuit, the government moved for summary judgment on the grounds that Liberatore was not acting within the scope of his employment and thus there was no waiver of sovereign immunity under the Federal Tort Claims Act. In Nationwide's lawsuit, Nationwide moved for summary judgment on the grounds that insurance coverage did not exist because Liberatore was acting within the scope of his employment and thus the government had indemnification responsibility; the government also filed a motion to dis-

---

[3]The language from *Steen* cited by the majority discusses the circumstances under which issue preclusion extends to principles of law. For example, a legal principle applied in an earlier action may have a preclusive effect in a later action if the factual scenario in the earlier and later action are the same. *Steen*, 106 F.3d at 913 & n.5. *Steen* does not support the proposition that a decision in a later action has a preclusive effect on an earlier action.

miss for lack of subject matter jurisdiction. The central question in both lawsuits was the scope of Liberatore's employment. *See id.* at 1160-61.

The district court granted the government's motion for summary judgment in Ivey's negligence action, and that order was not appealed. On the same day, and through a separate order, the district court denied the government's motion to dismiss and denied Nationwide's motion for summary judgment. On appeal in the Nationwide action, the government argued that Nationwide was bound by the decision in the Ivey action that Liberatore was not acting within the scope of his employment duties at the time of the accident, which was contrary to the position taken by Nationwide in its lawsuit. We rejected this attempted application of the issue preclusion doctrine, stating that "[a]lthough a district court judgment carries preclusive effect going forward, it cannot operate to bar direct review of an extant judgment." *Liberatore*, 408 F.3d at 1162 (citing *Orion Tire Corp. v. Goodyear Tire & Rubber Co.*, 268 F.3d 1133, 1136 (9th Cir. 2001) (holding that appeal could not be barred by claim preclusion based on a judgment that post-dated the judgment on appeal)). We thus held that Nationwide was not precluded from arguing on appeal in the Nationwide case that Liberatore acted within the scope of employment, and we decided that issue on the merits. *Id.* (stating that "a decision entered coincident with the judgment on appeal, just as a judgment entered after the judgment on appeal, 'can scarcely constitute a bar to the instant action' " (citation omitted)).

Here, the majority's use of the later-decided Cooper Order to preclude or limit review of the earlier-decided Mahan Order is contrary to our well-reasoned opinions in *Liberatore* and *Orion Tire*.[4] Therefore, I would review the Mahan Order without giving issue preclusive effect to the Cooper Order.

_____

[4]The Second Circuit has held that an issue decided in a later-in-time, non-appealed action can have issue preclusive effect on the prior decision

13978 United States v. Comprehensive Drug Testing, Inc.

Although the majority's analysis of the Illston Order does not suffer from the temporal flaw presented by the Cooper Order, its reliance on the preclusive effect of the Illston Order is also questionable. First, the Illston Order dealt with the April 30, 2004 warrant that the government presented to Judge Lloyd to search files in the government's possession, not the April 7, 2004 warrants that sought to search CDT and Quest Diagnostics, Inc. ("Quest"). This raises a concern about the scope of preclusion in terms of what was actually decided in the Illston Order. Second, the majority relies on the Illston Order to uphold Judge Mahan's finding that the government refused to follow the procedures set forth in *United States v. Tamura*, 694 F.2d 591, 596 (9th Cir. 1982). P.C. Op. at 13949. But Judge Illston did not make a clear finding regarding the government's adherence to *Tamura*. Finally, the majority upholds Judge Mahan's finding that "the government callously disregarded the affected players' constitutional rights" based on the Illston Order. *Id*. However, whereas Judge Illston's "callous disregard" finding was almost entirely premised on the government's issuing subpoenas and seeking search warrants in different district courts, Judge Mahan's finding appears to be premised on the government's adherence to the *Tamura* procedures. At a minimum, the use of a tool as powerful as issue preclusion in the context of such disparities is unwise, especially where Judge Mahan did not rule on the preclusive effect of the Illston Order. Accordingly, I would review the Mahan Order without reliance on the Illston Order.

## II.

Regarding the Mahan Order, I agree with the three-judge panel majority's thorough analysis and conclusions that (1)

that is on appeal. *See Grieve v. Tamerin*, 269 F.3d 149, 153-54 (2d Cir. 2001) ("The effect of the Southern District's final judgment was no different simply because the Eastern District action was the first to be ruled on at the district court level."). However, we have not adopted this variation of the issue preclusion doctrine and should not do so *sub silentio*.

the district court properly exercised its equitable jurisdiction under *Ramsden v. United States*, 2 F.3d 322 (9th Cir. 1993); (2) the government did not display a callous disregard for the constitutional rights of others in conducting its seizure of the materials from CDT, which gave rise to Judge Mahan's decision and order to return the materials seized from Quest; and (3) that it was not reasonable under all the circumstances for the district court to order the return of the subject property under Federal Rule of Criminal Procedure 41(g). *See United States v. Comprehensive Drug Testing, Inc.*, 513 F.3d 1085, 1103-13 (9th Cir. 2008). I do not restate those points here, but write to highlight aspects of my disagreement with the per curiam opinion's resolution of the Mahan Order.

Judge Mahan's decision with respect to the return of materials seized from Quest in Las Vegas, Nevada, on April 8, 2004 was premised on his view that these materials were poisonous fruit which acquired their taint as a result of the government's seizure of intermingled materials from CDT in Long Beach, California. The majority here does not appear to take issue with the government's physical seizure and removal of the intermingled materials from CDT, including a copy of the "Tracey directory." Consistent with our recommendation in *Tamura*, the government, anticipating that it might encounter intermingled relevant and non-relevant evidence in its search of CDT's computers and that an on-site search might not be feasible, crafted its April 7, 2004 warrant to provide for seizure and removal of such intermingled evidence for offsite review. *See* 694 F.2d at 596 ("If the need for transporting documents is known to the officers prior to the search, they may apply for specific authorization for large-scale removal of material . . . ."). Our subsequent decisions in the computer context have approved of the seizing of units that contain information authorized for seizure and information not described in the warrant where an on-site search is infeasible. *See Giberson*, 527 F.3d at 889-90 (holding that seizure of suspect's computer was justified, despite the potential for intermingling of relevant and non-relevant material, based

on the officers' reasonable belief that items enumerated in the search warrant could be found therein); *United States v. Hill*, 459 F.3d 966, 975-76 (9th Cir. 2006) (stating that wholesale seizure of materials is permissible where affidavit in support of warrant provides a reasonable explanation for why such a seizure is necessary); *United States v. Adjani*, 452 F.3d 1140 (9th Cir. 2006) (finding permissible the removal for off-site search of a suspect's computer along with the computer of a woman living with the suspect who was not identified in the warrant).

Apart from the government's arguments related to the plain view doctrine, I interpret the majority's primary concern to be Agent Novitsky's search of the Tracey directory after it was removed from CDT's premises.**[5]** *See* P.C. Op. 13951-52. The majority focuses on statements made by Assistant United States Attorney Nedrow at the hearing before Judge Mahan that the idea behind taking the Tracey directory was to provide Agent Novitsky with an opportunity to "briefly peruse it to see if there was anything above and beyond that which was authorized for seizure in the initial warrant."**[6]** P.C. Op. at

---

**[5]**I do not address here the government's argument that the plain view doctrine independently justified its search of the materials seized from CDT. I share some of the majority's concerns regarding broad application of the plain view doctrine to the search of computer data in this case. However, there are other contexts where application of the plain view doctrine might be more appropriate. *See*, *e.g.*, *United States v. Wong*, 334 F.3d 831, 838 (9th Cir. 2003) (applying plain view doctrine to discovery of child pornography in the context of a valid search of a computer for evidence related to a murder investigation). Accordingly, as discussed below, I cannot subscribe to the generalized requirement set forth in Chief Judge Kozinski's "concurring opinion" that the government foreswear reliance on the plain view doctrine in digital evidence cases or that magistrate judges insist on such a waiver by the government. Conc. Op. at 13966.

**[6]**Nedrow stated:

The agents, which [*sic*] some cooperation, limited cooperation from CDT, had identified a set — a subdirectory on an employee's computer named Tracy [*sic*], and this was the drug testing

13951. Although Nedrow's language is troubling on its face, Agent Novitsky acted with the reasonable purpose of learning the location of the relevant material in the Tracey directory. Upon encountering other potentially incriminating material in the Tracey directory, he sought a subsequent warrant. We have previously found this approach acceptable. *See Giberson*, 527 F.3d at 889-90 (holding that the district court properly denied the motion to suppress evidence of child pornography found on a copied computer hard drive during a search for evidence of the production of false identification cards pursuant to a valid warrant); *Adjani*, 452 F.3d at 1151 ("There is no rule . . . that evidence turned up while officers are rightfully searching a location under a properly issued warrant must be excluded simply because the evidence found may support charges for a related crime (or against a suspect) not expressly contemplated in the warrant."). Therefore, the majority's determination that the government's actions in this case were inconsistent with *Tamura* is inconsistent with our case law.

---

subdirectory with thousands of files, thousands of files on it. And the agents identified it, and they knew some of those files were going to have information definitely authorized for seizure under the Judge Johnson [April 7, 2004] warrant, but they also, frankly, had no ability to say that with respect to every file. Of course not. It's ridiculous, it's too large.

So the idea behind taking that was to take it and later briefly peruse it to see if there was anything above and beyond that which was authorized for seizure in the initial warrant. And that's what Agent Nivitsky [*sic*] did, and that's why Agent Nivitsky [*sic*] went to Judge Lloyd in San Francisco, because after perusing it he found some documents that contained information for the players in the case and some lists that contained that information, the ten players, but he also saw other things on there. And he said, okay, there are other things on here that show positive drug tests and that's of interest and as a plain view matter, based on the experience in the case, I know that constitutes possible criminal activity on its face but what I'm going to do is I'm going to get Judge Lloyd's authorization to seize all these other items.

In addition, the majority reads the warrant to state that the computer specialist, and only the computer specialist, was permitted to conduct the initial review of the commingled evidence seized from CDT. From this premise, the majority concludes that Agent Novitsky's involvement in that initial review of the seized materials constituted "deliberate overreaching." *See* P.C. Op. at 13952. But, as the majority of the three-judge panel stated, the warrant did not expressly limit the initial review to the computer specialist. *Comprehensive Drug Testing*, 513 F.3d at 1111. It provided that the computer specialist would be involved in the determination of whether on-site review of the computer files was feasible and in the segregation process. It did not, however, by its terms exclude other case agents. The majority calls reliance on the lack of any explicit exclusion in the warrant "sophistry," arguing that "the representation in the warrant that computer personnel would be used to examine and segregate the data was obviously designed to reassure the issuing magistrate that the government wouldn't sweep up large quantities of data in the hope of dredging up information it could not otherwise lawfully seize." P.C. Op. at 13952. However, that is an inference drawn by the majority and is but one of several reasonable inferences.[7] The record does not indicate precisely why that language was included in the warrant. The computer specialist may have been included to facilitate the search and segregation efforts, to ensure that data would not be destroyed, to assist in the navigation through the computer files, or to uncover any mislabeled or hidden files. These purposes do not necessarily require exclusion of all other case agents.

Even assuming some overreaching by the government, I would conclude that the return of the property pursuant to Rule 41(g) is not necessarily the appropriate relief in this case. The Advisory Committee Notes to the 1989 Amendments to Rule 41 state that "reasonableness under all of the

---

[7]Interestingly, the newly minted search protocols set forth in Chief Judge Kozinski's "concurring opinion" make clear that only persons not involved in the investigation may examine and segregate the data.

circumstances must be the test when a person seeks to obtain the return of property." *See also Ramsden*, 2 F.3d at 326. These notes further state that "[i]f the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable." Fed. R. Crim. P. 41, Advisory Committee Notes to 1989 Amendments (referring to then-existing Rule 41(e)). In *Ramsden*, we stated that "[t]he United States' retention of the property generally is reasonable if it has a need for the property in an investigation or prosecution." 2 F.3d at 326; *see also United States v. Fitzen*, 80 F.3d 387, 388 (9th Cir. 1996) ("Generally, a Rule 41(e) motion is properly denied 'if . . . the government's need for the property as evidence continues.' " *(quoting United States v. Mills*, 991 F.2d 609, 612 (9th Cir. 1993)). The government stated in its briefs and at oral argument that it has a continuing need for the seized property in connection with its ongoing investigation into the distribution of illegal steroids in professional baseball. Judge Mahan's order did not address this government need. At a minimum, a remand is warranted to develop this issue in the district court in the first instance.

Furthermore, I would find that the government's conduct in this case is not sufficiently egregious, in light of our case law, to warrant an order that the government return the seized property without retaining copies for its investigatory purposes.[8] Our decision in *Ramsden*, 2 F.3d 322, is illustrative. There, deputy U.S. marshals executed a provisional arrest warrant for Ramsden at his hotel room. The marshals asked Ramsden to

---

[8]The Advisory Committee Notes to Rule 41 state that the rule "avoids an all or nothing approach whereby the government must either return records and make no copies or keep originals notwithstanding the hardship to the owner." Fed. R. Crim. P. 41, Advisory Committee Notes to 1989 Amendments. Although these notes state that there may be some circumstance under which "equitable considerations might justify an order requiring the government to return or destroy all copies of records that it has seized," they further state that the rule, as amended in 1989, "contemplates judicial action that will respect both possessory and law enforcement interests." *Id.*

enter the hallway and then arrested him. When the marshals accompanied Ramsden back into the hotel room to retrieve some clothes, the marshals seized documents contained in a closed briefcase. They made this warrantless seizure despite having the opportunity to obtain a search warrant and conceded before the district court "that the search and seizure violated Ramsden's Fourth Amendment rights." *Id*. at 325. We held that the district court properly invoked its equitable jurisdiction under then-numbered Rule 41(e) and upheld the district court's conclusion that the marshals had demonstrated a callous disregard for Ramsden's constitutional rights. *Id*. at 325-27. Although we affirmed the district court's order that the government return the original documents to prevent Ramsden from suffering harm to his business, we allowed the government, in what the majority here calls a "compromise solution," to retain a copy of the documents for ongoing investigative purposes. *See id*. at 327; *see also* P.C. Op. at 13954-55.

Assuming that the government overreached in this case, its conduct was not as egregious as the marshals' conduct in *Ramsden*, where the government was permitted to retain a copy of the documents ordered to be returned. Unlike the warrantless search conducted in *Ramsden*, the government sought and received valid search warrants in this case, but then arguably erred in its execution of the warrants. Under these circumstances, *Ramsden* counsels a compromise solution as contemplated by Rule 41(g). Accordingly, I disagree with the majority's decision to affirm the Mahan Order.

## III.

Finally, I would vacate and remand the Illston Quashal. Judge Illston quashed the two subpoenas served on Quest and CDT on the grounds that their issuance constituted harassment and abuse of the grand jury process and was unreasonable under Federal Rule of Criminal Procedure 17(c). In essence, she stated two reasons for quashing the subpoenas:

(1) the subpoenas "served as an unreasonable insurance policy" for materials that the government had already seized through the use of search warrants; and (2) the government impermissibly executed a series of search warrants in three different districts once it learned that CDT would move to quash the January and March subpoenas, which was a "tactical decision" designed to prevent Judge White from ruling on the earlier-served subpoenas. Judge Illston stated that the government's tactical decision was unreasonable and constituted harassment.

Judge Illston's decision was based, in part, on the legal error that the government may not simultaneously seek the same information through grand jury subpoenas and search warrants. The majority agrees that this is legal error. *See* P.C. Op. at 13957 ("It isn't per se unreasonable to conduct an investigation using both search warrants and subpoenas."). Our case law allows the simultaneous use of warrants and subpoenas in light of the substantial differences between these devices, e.g., the differing levels of intrusion on a person's privacy, the ability and manner of challenging each device. *See In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 854-55 (9th Cir. 1991) (upholding the validity of grand jury subpoenas served at the same time as "functionally equivalent" search warrants, where officers allegedly sought to enforce the subpoenas through immediate seizure of the materials at issue). Accordingly, Judge Illston's conclusion that the subpoenas were unreasonable is infected by her misapprehension that the law did not provide for the simultaneous use of warrants and subpoenas.

This legal error also underlies Judge Illston's determination that the government made an unreasonable tactical decision to pursue search warrants in different districts in an attempt to "prevent" Judge White from ruling on earlier-issued subpoenas.[9]

---

[9] As noted in the original panel majority's opinion, Judge Illston made no finding that the subpoenas were "oppressive." *Comprehensive Drug Testing*, 513 F.3d at 1114 n.52.

But, as the preceding discussion indicates, the government was entitled to seek parallel search warrants and subpoenas, and the use of those devices is judged by different standards. Therefore, as the three-judge panel majority concluded, the government could have sought the search warrants notwithstanding the motion to quash the subpoenas pending before Judge White, and even if Judge White had quashed the subpoenas. *See Comprehensive*, 513 F.3d at 1114-15.

In addition, Judge Illston gleaned the government's intent behind the issuance of the subpoenas—in her view to harass CDT and Quest—based on its contemporaneous seeking of a series of search warrants. The hearing transcript indicates that Judge Illston was focused on the government's motivations and placed the burden on the government to provide "a substantial explanation" for both executing search warrants and issuing subpoenas, implying that doing so gave rise to a presumption of bad faith. From the existing record, it is difficult to discern the government's actual motive behind issuing the May 6th subpoenas. In any event, as indicated, the government was not obligated to provide an explanation for its decision to use two types of investigatory tools at its disposal.

Finally, the prejudice to the government from Judge Illston's misconception of the law may be seen in her failure to analyze the propriety of the subpoenas under the correct legal standard. A district court may quash or modify a subpoena "if *compliance* would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2) (emphasis added); *see also United States v. Bergeson*, 425 F.3d 1221, 1224 (9th Cir. 2005). For example, a district court may quash a subpoena when compliance would destroy a valid privilege, *see Bergeson*, 425 F.3d at 1225, when the subpoena seeks material that is outside of the scope of a legitimate grand jury investigation, *see In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d at 854, or when the subpoena would compel a person to incriminate himself or would violate a legitimate privacy interest of the

person served. *See United States v. Calandra*, 414 U.S. 338, 346 (1974).

Here, Judge Illston focused on the contemporaneous use of subpoenas and search warrants, which is not improper, and the government's related conduct,[10] but did not identify what aspect of the subpoenas would render compliance "unreasonable or oppressive."[11] She did not, for example, base her decision on a finding that the subpoenas exceeded the legitimate scope of the grand jury's investigation or that compliance would violate some valid privilege. Judge Illston's reasons for quashing the subpoenas were infected by the erroneous view that the government is not entitled to employ parallel warrants and subpoenas. As a result, the Illston Quashal should be vacated and remanded for an explanation that is not based on that premise.

## IV.

I disagree with the majority's conclusion that the Cooper Order and the Illston Order are entitled to issue preclusive effect in connection with our review of the Mahan Order. On the merits of the Mahan Order, I would reverse Judge Mahan's decision because the government acted reasonably in searching the Tracey directory. Even assuming that the government overreached, the district court's order for the wholesale return of property failed to account for the government's

---

[10]In the context of a charge of harassment, the Third Circuit has held that the repeated service of grand jury subpoenas on an individual does not constitute harassment that justifies quashing a subpoena. *See In re Grand Jury Matter*, 802 F.2d 96, 102 (3d Cir. 1986) (citing *In re Grand Jury Applicants, C. Schmidt & Sons, Inc.*, 619 F.2d 1022, 1028-29 (3d Cir. 1980)); *cf. United States v. Bell*, 902 F.2d 563, 566 (7th Cir. 1990) (holding that grand jury witness could not refuse to testify on the grounds that the government allegedly already had the answers to the questions to be asked of the witness).

[11]Indeed, Quest complied with the subpoena served on it. *See Comprehensive Drug Testing*, 513 F.3d at 1094.

13988 UNITED STATES V. COMPREHENSIVE DRUG TESTING, INC.

ongoing need for the information, a valid consideration when evaluating a motion under Rule 41(g). Finally, because Judge Illston appears to have misapprehended the propriety of the government using both warrants and subpoenas, I would vacate the Illston Quashal and remand for further explanation or proceedings. Accordingly, I respectfully dissent.

---

IKUTA, Circuit Judge, with whom Circuit Judge CALLAHAN joins, dissenting:

I agree with Judge Callahan's dissenting opinion, and I join it in full. I write separately to underline Judge Callahan's concern that "the return of property pursuant to Rule 41(g) is not necessarily the appropriate relief in this case." Dissent at 13982. Even if the government had violated the plaintiffs' Fourth Amendment rights, the remedy for the alleged violation imposed by the Nevada district court (Judge Mahan), and upheld by the majority, is both unprecedented and in conflict with the past several decades of the Supreme Court's Fourth Amendment jurisprudence. Although a party can seek the return of property under Rule 41(g), and the exclusionary rule may prevent illegally seized evidence from being used for particular purposes during criminal proceedings, ordering the government to expunge all the information it obtained from a search or seizure of property is inconsistent with the limited scope of the modern exclusionary rule. But that is just what the district court's order did: it directed the government not only to return the property seized during its search of Quest's facilities, but to destroy all traces of information derived from that search. I therefore dissent from the majority's affirmance of this order.

Because there is no criminal proceeding pending against the plaintiffs in this case, we analyze their motion for return of property as an equitable analog to a motion under Rule 41(g).[1]

---

[1]Federal Rule of Criminal Procedure 41(g), which was previously codified at Rule 41(e), states as follows:

See *Ramsden v. United States*, 2 F.3d 322, 324 (9th Cir. 1993) (recognizing that "district courts have the power to entertain motions to return property seized by the government when there are no criminal proceedings pending against the movant"). Such pre-indictment Rule 41 motions "are treated as civil equitable proceedings," *id.*, arising under the courts' "supervisory jurisdiction." *Richey v. Smith*, 515 F.2d 1239, 1245 (5th Cir. 1975). The Supreme Court has explained that a court's authority to suppress evidence, whether under the court's supervisory jurisdiction or under those provisions of the federal rules of criminal procedure expressly providing for suppression, is limited by the scope of the exclusionary rule. *See United States v. Payner*, 447 U.S. 727, 735-36 (1980) (holding that a federal court could not exercise its equitable supervisory powers to suppress evidence in circumstances where the exclusionary rule did not allow such suppression)*; United States v. Calandra*, 414 U.S. 338, 348 n.6 (1974) (holding that a motion for the return of property "does not constitute a statutory expansion of the exclusionary rule"); *see also Grimes v. Comm'r*, 82 F.3d 286, 290 (9th Cir. 1996) (holding that Rule 41 does not provide movants "any protection beyond that provided by the exclusionary rule"). Accordingly, courts must follow the Supreme Court's exclusionary rule jurisprudence when fashioning suppression remedies under Rule 41(g) or its equitable counterpart.

Over the past few decades, the Supreme Court has refined the rules governing suppression of evidence due to the government's Fourth Amendment violations and made clear that

---

Motion to Return Property. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

suppression is a circumstance-specific remedy. As the Court has recently explained:

> Suppression of evidence . . . has always been our last resort, not our first impulse. The exclusionary rule generates substantial social costs, which sometimes include setting the guilty free and the dangerous at large. We have therefore been cautious against expanding it, and have repeatedly emphasized that the rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging its application. We have rejected indiscriminate application of the rule, and have held it to be applicable only where its remedial objectives are thought most efficaciously served—that is, where its deterrence benefits outweigh its substantial social costs.

*Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (internal alterations, quotation marks, and citations omitted) (citing *United States v. Leon*, 468 U.S. 897, 907 (1984), and *Calandra*, 414 U.S. at 348, among others); *see also Herring v. United States*, 129 S. Ct. 695, 700 (2009) ("We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." (citing cases)).

Since *Mapp v. Ohio*, 367 U.S. 643 (1961), the Court has adopted numerous exceptions to the exclusionary rule, such as the "good faith" exception first enunciated in *Leon*. Most significant for this case, the Court has held that even illegally seized evidence may be used for a variety of purposes. *See Calandra*, 414 U.S. at 351-52 (holding that the exclusionary rule does not apply to grand jury proceedings); *see also United States v. Havens*, 446 U.S. 620, 627-28 (1980) (holding that evidence obtained in violation of the Fourth Amendment can be used to impeach a defendant's testimony at trial); *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978) (holding that evidence obtained in violation of one person's Fourth Amend-

ment rights can be used against another person whose Fourth Amendment rights were not violated by the search or seizure). Accordingly, under the Supreme Court's precedents, remedies for Fourth Amendment violations must be carefully tailored to fit both the underlying violation and the government's legitimate competing interests in using the illegally seized evidence. *See Grimes*, 82 F.3d at 291 ("Because the government may now use illegally obtained evidence in a variety of situations, it should be permitted to retain copies of such evidence absent extreme circumstances not apparent from this record."); *see also In re Search of Law Office*, 341 F.3d 404, 412 (5th Cir. 2003) (noting that changes in the Court's exclusionary rule jurisprudence cast doubt on earlier opinions holding that victims of an unlawful search had right to obtain return of all copies of documents).

The majority acknowledges that a court's suppression power is "limited by the exclusionary rule," but contends that *Payner* and *Calandra* are inapt because they involved "the suppression, not the return, of seized materials," and in this case "no motion to suppress . . . is before us." Maj. op. at 13953. But the majority appears to misunderstand the Nevada district court's order. In conducting its search of the Quest facility, the government seized urine specimens and made copies of information maintained on Quest's computers. The first part of the district court's order directs the government to "return to moving party MLBPA . . . all materials seized from Quest . . . other than materials relating to the ten baseball players named in the original April 8 warrant." This part of the order applies only to the urine samples, the only physical materials seized from Quest.[2] The second part of the

---

[2]It is uncertain whether even this part of the order constitutes an order for return of property, rather than a suppression order, given that the MLBPA's property interest in the urine samples is unclear. Unless "the property in question is no longer needed for evidentiary purposes," the "movant bears the burden of proving . . . that he or she is entitled to lawful possession of the property." *United States v. Martinson*, 809 F.2d 1364,

court's order requires the government to "segregate, seal, and make no further direct or indirect use of, all notes, summaries, and other records of information seized from Quest on April 8 and May 6 relating to testing of persons other than the ten baseball players named in the April 8 warrant."**[3]** This part of the order applies to the copies the government made of Quest's computer files. Whether we use the label "sequestration," as the majority does, maj. op. at 13956, or some other term like "divestiture" or "expungement," the substance of this part of the order is the same: it required the government to refrain from using information about the players, not to return their property. A motion for return of property is a remedy for a party "aggrieved by a deprivation of its property." *In re Search of Kitty's East*, 905 F.2d 1367, 1375 (10th Cir. 1990) (emphasis added). Here, the Players Association is not "aggrieved by the deprivation" of its property, maj. op. at 13954; it is aggrieved by the government's possession of inculpatory evidence.

---

1369 (9th Cir. 1987); *accord* Fed. R. Crim. P. 41, Notes of Advisory Committee on 1989 amendments ("The amended rule recognizes that reasonable accommodations might protect both the law enforcement interests of the United States and the property rights of property owners and holders."). I am aware of no court which has held that bodily fluids voluntarily given away, and held in possession by a third party, are owned by the donee. Nor does the standard of lawful possession, as opposed to ownership, resolve the matter. Quest had the urine samples, not the MLBPA, and at oral argument the MLBPA's attorney admitted that no contractual property interest in the samples was granted by the laboratory. Finally, the Nevada district court's order instructed the government to surrender the urine samples to a third-party laboratory, not return them to the MLBPA or Quest. The majority's reliance on the players' "privacy interests" in the urine samples, maj. op. at 13954, as opposed to their property interests, simply highlights the fact that the majority is affirming a suppression order.

**[3]**The majority's statement that the "uses the government may make of the Quest evidence during a criminal proceeding must be decided in the context of such a proceeding," maj. op. at 13954, is inconsistent with the language of the order, which by its terms precludes the government from making any "further direct or indirect use" of the Quest information.

Moreover, a successful motion for the return of property does not prevent the government from continuing to use information derived from the property or from later using the property as evidence. *See* Fed. R. Crim. P. 41(g) (if a court grants a motion for return of property, it may "impose reasonable conditions to protect access to the property and its use in later proceedings"). As we have explained:

> If a district court determines that property has been illegally seized, the proper question in deciding the merits of a 41(e) motion is not whether the officers acted in good faith, but whether returning the illegally seized documents would be 'reasonable under all of the circumstances.' If the government's investigatory and prosecutorial interests can be served by retaining copies of the documents, it is unreasonable for the government to refuse to return original documents to the owner.

*J.B. Manning Corp. v. United States*, 86 F.3d 926, 928 (9th Cir. 1996) (quoting *Ramsden*, 2 F.3d at 326-27) (internal citation and alteration omitted). Accordingly, even in ordering a return of the urine samples, the district court should have imposed "reasonable conditions," such as allowing the government to keep part of the samples while returning the rest to Quest or the players, in order to "protect access to the property and its use in later proceedings." Fed. R. Crim. P. 41(g). Nothing else would have been necessary, since Quest retained the original records (the government took copies) and Quest never owned the government's notes in the first place.

Instead, the district court's order denies the government use of evidence which, at least according to the majority and the district court, was obtained in violation of the Fourth Amendment. The district court's "sequestration" remedy differs from a typical suppression remedy only because it is broader; it categorically prohibited the government from using the seized evidence for *any* purpose, despite the Supreme Court's clear

instruction that suppression must be tailored to a specific purpose. *See Calandra*, 414 U.S. at 348 ("[T]he exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons."). Thus the essence of the majority's position is that the district court's "sequestration" remedy is not subject to the Supreme Court's rule against broad and categorical suppression remedies so long as it is labeled an order for "return of property."

Like the district court, the majority cites no precedent for such a "sequestration" remedy. *Ramsden*, quoting the Advisory Committee notes to the 1989 amendments to Rule 41, merely left open the possibility that, "in some circumstances . . . equitable considerations might justify an order requiring the government to return or destroy all copies of records it has seized." 2 F.3d at 327 (alteration omitted). As Judge Callahan's dissent points out, *Ramsden* did not decide this question; although we determined the government acted with "callous disregard for Ramsden's constitutional rights," we concluded that the government was justified in "copying the documents and turning them over to British authorities" while returning the originals to Ramsden so that he could run his business. *Id. Ramsden*'s dicta must bow to Supreme Court precedent. Thus although I acknowledge that *Ramsden* did not rule out the possibility of a "sequestration" remedy, I conclude that the Supreme Court's recent exclusionary rule jurisprudence prevents us from expanding the district courts' suppression authority so broadly.

In this case, assuming the government's seizure of evidence of criminal wrongdoing violated the Fourth Amendment rights of the parties, Supreme Court precedent may support an order precluding the government from using such evidence in subsequent criminal proceedings against the players. But ordering the government to forget that a large number of individuals have engaged in criminal behavior runs directly contrary to the Supreme Court's modern Fourth Amendment jurisprudence and fails to consider the "substantial social

cost" of the exclusionary rule. *Leon*, 468 U.S. at 907. At the very least, preventing the government from using any evidence derived from the search of Quest's facilities cannot be reconciled with *Calandra*, which would allow the use of illegally seized evidence in future grand jury proceedings. *See* 414 U.S. at 351-52.

By affirming the Nevada district court's order, whatever the label, the majority ignores the Supreme Court's direction that there is no such thing as a categorical suppression remedy. For this reason, as well as the reasons expressed in Judge Callahan's dissent, I respectfully dissent.